## Fidelity Insurance Company's Appeal.

1. Upon sufficient cause shown a decree of divorce may be vacated, although the libellant is dead and more than twelve years have elapsed since the decree was made.

2. In a proceeding to vacate such a decree, after the death of the party who procured it, the party applying is within the exceptions to the Act of 1869 and is not a competent witness.

February 23d 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, and STERRETT, JJ. GREEN, J., absent.

Appeal from the Court of Common Pleas, No. 3, of *Philadelphia county*: Of January Term 1879, No. 141.

Appeal by the Fidelity Insurance, Trust and Safe Deposit Company from a decree setting aside a decree of divorce in a proceeding wherein James V. Peterson was the libellant and Sarah Peterson the respondent.

On the 9th of February 1878, Sarah Peterson filed a petition in the Court of Common Pleas which set forth that the petitioner is the widow of James V. Peterson, who recently committed suicide by jumping from a steamboat; that she was married on the 22d of September 1849, at Flemington, New Jersey, and

immediately accompanied her husband to his home in Trenton, New Jersey, where she resided with him about one year. Thereafter she resided with him at Knoxville, Tennessee, Cincinnati, Harrisburg, and at Philadelphia, coming to Philadelphia in the latter part of the year 1851, or early part of the year 1852, where she continued to reside with the libellant as his wife, and left the city of Philadelphia, by her said husband's consent and express direction, on the fourth day of November 1858, to reside with her mother at Flemington, New Jersey, until such time as her said husband should request her to return to his home; that petitioner continued to reside at her mother's residence, with the full concurrence of her said husband, until October 24th 1865, when she returned to her said husband's home at his special request, and continued to live with him as his wife until the month of February 1867, when she left at his request on account of the unsound condition of his mind and his expressed fear of doing her bodily harm; that during the time she resided away from her husband's home, she received visits from him at her home in Flemington, New Jersey, and that her husband, the said libellant, contributed to her support during all the time she resided away from his home, until February 1867, when he gave her some money to go to her mother's home; that your petitioner during her absence from her husband's home received from him a number of letters in which she was recognised by him as his wife, and by reason of which at his request she went to Philadelphia to sign the deeds for properties he had sold after the date of the decree of divorce, several of said letters bearing date subsequent to the date of the decree of divorce, made by the old Court of Common Pleas of said county; that the decree of divorce was made on the 24th of June 1865, and that she did not receive any notice or have knowledge of a divorce, having been applied for or obtained until the month of November 1877, which was after the date of her husband's death, which occurred on the 10th of November 1877; that petitioner utterly denies any desertion on her part, and charges that her husband intended the divorce when he requested her absence. That he did not disclose such purpose to your petitioner, who was left uninformed and unadvised of such proceedings to prevent her just resistance and defence thereto. The petitioner then prayed that the decree of divorce might be vacated.

A rule to show cause was granted, and depositions taken on both sides. The facts will be found in the following opinion of Yerkes, J., in the court below.

"In June 1863, James V. Peterson filed his libel in divorce, alleging desertion on part of his wife, Sarah Peterson. May 25th 1865, an examiner was appointed, and in June of the same a divorce was decreed.

"This decree she now seeks to have vacated, on the ground that,

although she had notice of the institution of proceedings, she was led to believe that they had been discontinued, and she and her husband had resumed the marital relation before the decree, and continued in it for about two years after decree, and that there was no wilful and malicious desertion within the meaning of the Act of Assembly.

" Much of the testimony introduced is that of the wife. We think that in this matter she should not be heard. Her husband being dead she is certainly within the spirit of the exceptions of the Act of 1869, and again, as at that time she was not a competent witness, she cannot be heard now to impeach the propriety of a divorce granted when her evidence would not have been received. We look therefore at the record, the evidence of other witnesses of the letters of the libellant and those of the respondent produced on call.

" The record shows she was not served, and that no steps were taken beyond filing the libel for almost two years. The letters show that a separation took place in 1858, but that a correspondence, more or less intimate, was kept up between the parties. The letters in evidence refer to others not produced, but we have enough to show the relation of the parties, and to show the various changes in their disposition and intentions. We have nineteen letters of Mr. Peterson written to Mrs. Peterson between May 1863, and November 1865, and six written by Mrs. Peterson. This correspondence also shows frequent interviews.

" The letters of the parties between May 25th and September 7th 1863, show that the parties after the long separation of five years were mutually of the opinion that they should be legally separated. It also appears that in this Mrs. Peterson was the more urgent. In the letter of September 7th it appears that Mr. Peterson had declared that he would take no further trouble in the matter of a separation.

" On May 27th, Mr. Peterson, referring to his wife's note of May 25th 1863, writes to her that he desires to converse with her upon the matter mentioned in her note. On June 9th 1863, she writes to him that his letter of the 2d is received, and that she is willing to allow him to commence proceedings as soon as possible. The letter of the wife of September 7th 1863, is the most important of any of the letters of this period. It is quoted entirely :

" FLEMINGTON, September 7th 1863.

" James, yours of the 2d is received. I first wrote you on 25th of May, stating that I thought it best for us to sever this matrimonial tie which has become so irksome to each of us.

" You requested me to come to the city, as you wished to converse with me on the subject. I could not make it convenient then to come, and wrote you to that effect. You then assured me

[Fidelity Insurance Company's Appeal.]

in your letter of the 2d of June that you had no opposition to offer to the request made by me in my note of the 25th, but would have my wish carried into effect as early as possible, as you were of the opinion that you could manage the matter better than I could, and by so doing could save me much time, trouble and expense. I then gave the matter over to you, supposing you would do what was right. Now, at the expiration of nearly four months, you write that if I am determined to have my own way in the matter you will give yourself no further trouble. I was not aware that I manifested any wilfulness whatever. I merely wished to know whether it was actually necessary for me to go to the city, and if so I would come. I am willing to do all in my power to facilitate the matter; but if you have given the matter over, as you say, why I shall be obliged to have it carried into effect myself, and that without any further delay.

Yours, in friendship,

SARAH PETERSON.

"It does not seem that thus far there is any evidence that she knew that proceedings had been actually commenced. It is evident that in some letter not in evidence she had inquired if there was an actual necessity for her to come to the city. When he, in consequence thereof, expressed his determination to give himself no further trouble, had she not a right to think he was doing nothing, and does not the expression of her determination to act show that she believed that he was not acting?

"Her letter of September 27th 1863, shows a most loving spirit towards her husband. It also shows that an interview had taken place, in which the subject of a reconciliation had been discussed. Her desire for a reunion is very apparent, and there is an entire change from the desire for a separation shown in the letter of September 7th. Upon October 17th, he writes to her requesting her to come down to join in a deed, and expresses his intention, if her father and mother are willing, to accompany her to her home in Flemington, N. J. On December 14th, he writes her, acknowledging the receipt of a letter dated the 8th, which said that she expected him to spend Christmas with her at her home in Flemington. He answers that he cannot promise, but that he will be glad to do so. It is clear from these letters that a reconciliation had taken place, but they do not show an actual reunion, although it is clear that the woman who wrote the letter of September 27th 1863, would have followed him to the end of the world if he had wished it. Why she did not do it we cannot exactly see, until his letter of February 18th 1864, is read. In it he acknowledges the receipt of hers of the 13th, and says: 'As to our domestic difficulties I have nothing new to say, excepting, perhaps, that I do not think I can in justice ask you to leave your father and mother

again for me. I am sorry to say so, but I cannot help it.' Upon the argument much was made of her letter of February 24th, which was in answer to this. The wonder is that she did not say more. All that she did say was justified by what he had said. She truly says, that if he earnestly desired a reunion, as he said, he would not let father nor mother nor anything else on earth stand in the way. From this time forth it cannot be said that there was wilful and malicious desertion on the part of this wife.

"There are but two more letters of the wife in evidence. They are relied on as showing that she knew that a suit in divorce had been begun. From them alone it is hard to say whether the divorce case alluded to was '*in esse*' or '*in fieri*.' At all events she did not seem to know that anything was being done. In her letter of September 18th 1864, she wants to know if it remained the same as when she was down, or had further steps been taken. Then comes the following letter of November 31st 1864.

"FLEMINGTON, Nov. 31st 1864.<br>
Monday Evening.

"Dear James:—Yours of the 17th was duly received. You say that you are sorry that I cannot properly appreciate your motives and feelings in saying that you cannot ask me to leave home again. I do understand you perfectly well. You do not wish to destroy the peace and happiness of my father and mother for the sake of promoting your own.

"James, as my parents are so strongly opposed to a reunion, I am compelled to say that you will be obliged to have the divorce carried out.

"James, the blessed hope which will sustain me through the remainder of my lonely life will be that we shall meet again; though it may be never in this life, there is a world of bliss beyond this vale of tears, where sorrow and grief are unknown.

"I was glad my picture was a good one. How I should like to have one like it, so that we could each have one alike. Please think of me sometimes as

Your unhappy wife,<br>
SARAH PETERSON.

"He takes no step in the divorce suit, but as her letter of September 7th 1863, brought about the reconciliation disclosed in her letter of September 27th, it seems that this letter of similar tone had the same result. It appears that when she tired of her anomalous condition, expressed her intention of ending it, then he wanted to be reconciled and reunited, but when she was willing he was not. The meagre evidence in the case does not disclose all the steps leading to the reconciliation taking place subsequent to her letter of November 31st 1864, but it is clear that it took place speedily,

and that there was no break or hitch until she finally left his home in 1867.

" In his letter of January 14th 1865, he speaks of a recent visit to her at Flemington. Upon February 24th 1865, he writes that he had expected to have been in Flemington before he wrote, but that on account of the draft he was unable to do. He writes again March 16th. In this letter there is nothing material, other than it shows the continuity of the amicable relation. Several witnesses testify as to a vist he made to his wife at Flemington in April. It was of several days duration, and is fixed as occurring just after the death of Mr. Lincoln. It may as well be noticed here that a visit was also made by him late in the summer of 1865. Mrs. Forker, the mother of the respondent, and with whom she lived, in her deposition says, that Mr. Peterson made several visits to his wife in 1865, that the visits lasted generally from Saturday to Monday, and that they occupied the same room.

" We have no letters of either party during the months of May, June and July 1865, and no testimony as to the relation of these parties during that period. The record shows the appointment of an examiner upon May 25th 1865, and a decree June 24th 1865.

" Upon August 8th 1865, he again writes to her, and in the next ten weeks he writes her seven letters, all of which are addressed to Mrs. Sarah Peterson. In that of August 8th, he speaks of the prospective visit of his nephew Charles to her at Flemington. Charles lived with them before they separated, is spoken of frequently in this correspondence, and seems to have been almost like an adopted child of Mr. Peterson. In his letter of August 28th, he acknowledges the receipt of her letter of the day before, and says that he is glad to hear that Charley is contented, and wishes a good place could be obtained for him there. Upon August 28th, he again speaks of Charley's visit, his wish that he could find a place for him there, and of his own expectation to visit Flemington on the succeeding Saturday. Upon September 6th, he writes to her of the liklihood of his selling a house, and asks her to come to the city to acknowledge the deed.

" His letters to her dated October 6th, 11th and 19th 1865, are remarkable, coming from a divorced man to his divorced wife, and cannot be reconciled with her knowledge of the divorce, and seem totally inconsistent with his knowledge of it. The letter of October 11th does not in its heading indicate the year distinctly, but its substance shows it to be subsequent to that of October 6th, and that it is one of this series of letters. In that of October 6th, he says that he went to Flemington on Monday to see if she would come to him, that she did not seem able to make up her mind, that her father had said that if she left, he and his wife would break up and board, that he did not want this done, and had concluded, as

soon as he could, to sell out in Philadelphia, to go to Flemington, buy her father's house, so that all could live together. After much more, he closes thus : 'You must be your own judge whether you come on Monday or not; the number is 1245 North Eleventh street.' He adds, in a postscript, that the reason he speaks of going to Flemington and buying her father's house, is that she suggested it on Tuesday night. In the letter of October 11th he addresses her as ' My dear wife,' in all others as ' My dear Sarah,' or ' Dear Sarah.' He speaks of his disappointment in having received a letter from her instead of seeing her. Then says that he has never been so miserable and unhappy since their separation, as he has been since her father said if she left, he and her mother would break up and board. This fixes the letter as having been written in 1865, subsequent to the conversation detailed in his letter of October 6th. The rest of this long letter is full of consideration of her duty to her aged parents, and seems to concede that her prior duty is to them ; but its unhappy tone would bring a true woman to her husband if she loved him at all. Upon October 19th, he writes that he has told his servant that he will keep house no longer with her. He also says that he will not give the person who wishes his house a decided answer, for in his own words, ' I would like to know if you are still of the opinion that you would be willing to come and give it a trial of being alone in the house during the day before you bring all your goods.'

" The next we know is that they are living together at the house mentioned in the letter of October 6th. Mrs. Forker's testimony clearly established that they were so living in 1866. The evidence of several witnesses also establish the fact that Mr. Peterson always spoke of the petitioner as his wife, and that this continued up to his death. They separated in 1867, and met but once afterward. On November 4th 1865, he made a deed in which she joined as his wife.

" The conduct of Mr. Peterson is entirely inexplicable. Twice, when he and his wife seemed to have reconciled their difficulties and were upon the point of re-uniting, he prevents a re-union by referring to her duty to remain with her parents.

" Again her duty to her parents is put in a strong light just before the final re-union. There is nothing in the correspondence to show that he was not acting in good faith. His anxiety for their welfare seems entirely sincere. He obtained, however, divorce, and must have known it ; he certainly remembered it, since after the final separation he passed titles without her joining. Before the divorce, whilst they were separated, he had her to join in his deeds. We hardly think that he intended to perpetrate the great outrage that was done to his wife. We think it the result of mental rather than moral obliquity.

" Can this decree be vacated ? The case is clear of certain ele-

ments which have embarassed the consideration of others. Here there was no subsequent marriage, and the offer of the petitioner, made in open court, to release her interest in all properties conveyed by her husband without her joining, relieves it of all solicitude for purchasers, whether for value or not. The case of Smith v. Smith, 3 Phila. R. 489, also reported as Boyd's Appeal, 2 Wright 241, is authority here. The grounds of divorce there were desertion. The depositions taken on behalf of the petitioner showed, as they do here, that there was no wilful and malicious desertion. Here in addition, we have the resumption of the marital relation. It was argued here, that in that case the year for an appeal had not elapsed, but that does not appear to have been considered material by the Supreme Court in that case, nor in the earlier case of Allen v. McClellan, 2 Jones 328. Ordinarily control of a judgment expires with the current term, but this rule does not hold where a judgment has been obtained surreptitiously or fraudulently. Nor does there seem to be any reason why it should where there is no one interested except the parties to it and their heirs.

"Is there anything to conclude her. Ordinarily knowledge or notice of any kind, ought to conclude parties after decree. But even if it is granted that she had actual knowledge, we think there was enough in this case to convince her that the proceedings had been abandoned. From his letters we find he made her several visits in 1865, and at least two other visits in that year are established by oral testimony. Both before and after the divorce his visits were those of a man to his wife. How complete their reconciliation was at this time, before the divorce, is shown in that soon afterwards she left her parents to go to him, notwithstanding his recognition of their great need of her, and his almost persuasion of her to remain with them. What else could she think but that all their difficulties were at an end. There is no evidence or pretence that she knew more of the divorce than is contained in the correspondence. In the light of his intercourse with her, his frequent visits, their reunion and living together as man and wife, we must say that we believe that he led her to believe that the divorce suit, if she ever knew of it, had been utterly abandoned, and that the decree obtained was a fraud upon her.

"Upon filing in this court an agreement to release all grantees of property conveyed by her husband during coverture, and after said decree, without her joining from all claim of dower, and recording such a release in general terms as to such grantees in this county, the decree will be vacated.

"The above condition is made because of the offer of petitioner."

A decree was entered accordingly, when the appellant, the administrator of James V. Peterson, deceased, took this appeal.

[Fidelity Insurance Company's Appeal.]

*John W. Patton* and *Charles Hart*, for appellant.—The application to set aside the decree of divorce entered thirteen years before the petition to vacate it was filed, is in the nature of a bill in equity. He who comes into equity must come with clean hands. Did the petitioner fulfil this requirement? The basis and foundation of her case is stated in her petition to be her entire ignorance that proceedings in divorce had ever been commenced by her husband. On this vital point she is contradicted by her own letters.

The application to vacate the decree was too late. There is no authority to vacate a decree of divorce after such a lapse of time. The application to set aside the divorce resolves itself into a question of distribution of the libellant's estate after his death. In such litigation it would be inequitable to wrest from his heirs and personal representatives an inheritance cast upon them by the law, solely to give it to a woman from whom he had been legally divorced; who had, while her husband was alive, acquiesced in it for over twelve years, and who did not present her petition to set the decree aside until nearly three months after the libellant's death: Singer *v.* Singer, 41 Barb. 139.

*H. W. Gimber* and *Thomas Greenbank*, for appellee.—The appellant did not know of the divorce until a short time before she made this application to court. Fraud vitiates everything it touches, and time is not an element in this case. All the testimony shows conclusively that appellee did not know of the divorce, and none of her letters disclose the fact of knowledge. The court will set aside a decree of divorce even where one of the parties is dead, where fraud has been practised: Smith *v.* Smith, 3 Phila. R. 489; Boyd's Appeal, 2 Wright 241; Allen *v.* McClellan, 2 Jones 328; Van Leer *v.* Van Leer, 1 Harris 213.

The judgment of the Supreme Court was entered, March 8th 1880,

Per Curiam.—We have examined with care the evidence in this case, and concur entirely in the opinion delivered by the learned judge in the court below.

  Decree affirmed, and appeal dismissed at the cost of appellant.